IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | * * | Civil No. 04-MD-15863 |
| NIKITA MEHTA<br><br>v.<br><br>AIG SUNAMERICA LIFE ASSURANCE CO. | * * * * * | Civil No. JFM-04-3943 |
| WIGGENHORN<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE CO. | * * * * * | Civil No. JFM-05-1674 |
| WOODBURY<br><br>v.<br><br>NATIONWIDE LIFE INSURANCE CO. | * * * * * * | Civil No. JFM-04-3944 |

*****

MEMORANDUM

The plaintiffs in these actions purchased variable annuities from the defendant insurance companies that included mutual funds as investment options. Certain of these funds, in which the plaintiffs invested, contained foreign securities. They now seek compensation for the alleged dilutive damage their holdings suffered as a result of market timers that exploited the funds'

1

"stale" prices.[1] However, in apparent contrast to the core allegation of the class investor and derivative actions that market timing was concealed from everyday investors, *see In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 872, plaintiffs do not make any explicit allegations of misrepresentation, fraud, or deceit, which would have facially brought their complaints within the ambit of Rule 10b-5. Rather, in an effort to avoid the preemptive scope of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227, they allege only that the defendants negligently breached state common law duties by incorporating the stale mutual fund prices into the value of the variable annuity accounts.

Now pending before me are the defendants' motions to dismiss the amended complaints. Because the facts and legal arguments presented by each of these three actions are materially indistinguishable, there is no need to write separate opinions. For the reasons stated below, I will grant the motions.

I.

A variable annuity is an insurance product designed to protect the policyholder from outliving her retirement nest egg. *See* U.S. Securities and Exchange Commission, *Variable Annuities: What You Should Know*, *at* http://www.sec.gov/investor/pubs/varannty.htm. To that end, a variable annuity offers a range of investment options, the most common being mutual

---

[1] Because most mutual funds calculate their net asset value per share ("NAV") only once per day—at the close of the New York Stock Exchange—there is a potential that the NAV will become "stale" because it does not incorporate the most recent market information. Roberto M. Braceras, *Late Trading and Market Timing*, 37 Rev. Sec. & Commodities Reg. 61, 64 (April 14, 2004). "This is most common in mutual funds that invest in international securities, where the markets close many hours before the U.S. market. For example, if U.S. stocks rally after the international markets have closed for the day, the value of the international securities on that day will not reflect the rise in the U.S. market." *Id*.; *see also In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 851 n.1 (D. Md. 2005).

funds,[2] and are characterized by three distinctive features: earnings are tax-deferred; the purchaser can receive periodic payments from the insurance company for up to as long as the rest of her life; and a death benefit is paid out to a designated beneficiary upon the purchaser's death. *Id*.

There are generally two phases to investing in a variable annuity. During the "accumulation phase," policyholders allocate their principal and subsequent gains between a fixed account and a variable account. *Id*. The former is equivalent to a money market account in that it simply pays a fixed amount of interest, while the latter is divided into sub-accounts that correspond to the various investment options available under the plan. *Id*. So, for example, during this phase a policyholder could invest $10,000 in an annuity, allocating $4,000 to the fixed account and $6,000 to the variable account, dividing the latter equally between three sub-accounts: a large-cap U.S. stock fund, a U.S. government bond fund, and a small-cap international stock fund. Once the "payout phase" begins, the policyholder receives from the insurance company the principal she invested plus or minus any investment returns. She can choose to receive this money as either a lump-sum payment or a stream of periodic payments stretched over a set time period.[3] *Id*.

The money policyholders allocate to a particular sub-account becomes the property of the insurance company and forms a pool of assets with which the company then purchases shares of the designated mutual fund. Policyholders do not, therefore, own the fund shares themselves.

---

[2] The insurance companies that sell variable annuities do not manage the underlying mutual funds themselves, but instead contract with various fund managers to handle this responsibility. None of the managers that the defendant insurance companies contracted with has been named as a defendant in these actions.

[3] If periodic payments commence upon the purchase of the annuity, there are no separate phases and the annuity is referred to as an "immediate annuity." U.S. Securities and Exchange Commission, *Variable Annuities: What You Should Know*.

Instead, they own Accumulation Units ("AU") in the sub-account. At issue in these actions is the method by which the defendant insurance companies value an AU.[4]

The initial value of an AU is set when the sub-account is created and the insurance company purchases the first shares of the mutual fund. Defendant Nationwide, for example, arbitrarily set the value of all AUs at $10. (Nationwide Policy at 6). Thereafter, the value of an AU in a particular sub-account is calculated by multiplying the value of the AU from the prior Valuation Period by the Net Investment Factor for the subsequent Valuation Period. (*See e.g.*, *id.*). A Valuation Period is the interval between closings of the New York Stock Exchange ("NYSE") on days that it is open for trading, *e.g.*, 4pm EST on Friday until 4pm EST on the next Monday. (*See e.g.*, *id.*). Closings of the NYSE mark the beginning and end of these intervals because it is at that time that most mutual funds calculate their NAV. *See supra* note 1. As for the Net Investment Factor, it is generally determined by dividing (1) by (2) and then subtracting (3) from the result, where (1) is the NAV of the mutual fund held in the sub-account during the current Valuation Period; (2) is the fund's NAV during the prior Valuation Period; and (3) is a percentage factor representing the policy's mortality risk premium and expense risk charge.[5] (*See e.g.*, Nationwide Policy at 6).

---

[4] For the following description of how sub-accounts are valued, I employ the terminology used by Nationwide. (Nationwide Policy, Exhibit A to Nationwide Br.) The underlying methodology, however, is consistent among the defendants.

[5] To illustrate in numbers how this calculation works, assume an initial AU value of $50 within a particular sub-account, to which a policyholder allocates $1,000 during Valuation Period 1. This investment entitles the policyholder to 20 AUs. Assume further that the NAV of the underlying mutual fund is $40 during Valuation Period 1, and that at the subsequent close of the NYSE, the beginning of Valuation Period 2, the NAV is recalculated at $48, a 20% increase over the prior period. If the combined charge for the mortality risk premium and expense risk charge is 5%, then the Net Investment Factor for Valuation Period 2 would be 15%. The value of an AU would therefore increase by that percentage to $57.50, meaning that the policyholder's 20 AUs would be worth $1,150 in Valuation Period 2.

Thus, if a mutual fund that contains foreign securities has a stale NAV, the value of the corresponding sub-account's AUs will be affected through the Net Investment Factor. For any purchases or redemptions of fund shares at a stale price will skew the NAV growth rate between Valuation Periods. The impact of such trades on policyholders invested in the sub-account is not always negative, however. To be sure, the value of their AUs is diluted when purchases are made when the underlying fund is undervalued, or when redemptions occur when the fund is overvalued. But their investment is artificially *inflated* when overvalued shares are purchased or undervalued shares are redeemed.

II.

These putative class actions initially were brought on behalf of all variable annuity policyholders who invested in sub-accounts that had mutual funds containing foreign securities, and who did not engage in market timing. The complaints were all filed in Illinois state court and pled various state law causes of action. Those claims, however, can be boiled down into two broad categories. First, the defendants acted negligently and/or recklessly by relying upon stale NAVs in calculating the value of policyholders' sub-account investments. Second, the defendants deceived policyholders by not informing them of the potential for market timing and the harm it entails.

The defendants removed each of these actions to the U.S. District Court for the Southern District of Illinois and moved to dismiss them on the basis that the claims were preempted by SLUSA. Before the court ruled upon the motions, the Judicial Panel for Multidistrict Litigation transferred the actions to this court.

In an effort to buttress their argument against SLUSA preemption, the plaintiffs filed

5

amended complaints, either immediately before the transfer or shortly thereafter, that eliminate any explicit mention of misrepresentation and deception, and that plead only one cause of action: common law negligence. Specifically, the complaints allege that the defendants acted negligently by failing to (1) evaluate "price relevant information" after the close of the foreign securities markets and adjusting the value of sub-account AUs accordingly, and (2) implement policies and procedures to protect policyholders from the dilutive effect of stale price trading. In response to the amended complaints, the defendants have again moved to dismiss.[6]

III.

As amended by SLUSA, the Securities Exchange Act of 1934 states:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).[7] Variable annuities are "covered securities." *Id*. § 78bb(f)(5)(E); *see e.g.*, *Dudek v. Prudential Securities, Inc.*, 295 F.3d 875, 878 (8th Cir. 2002); *Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1024 (9th Cir. 2002); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001). Further, all of these suits are "covered class actions" because the plaintiffs seek to represent more than 50 investors and each action is direct rather than derivative. 15 U.S.C. § 78bb(f)(5)(B)-(C). At issue, then, is whether the negligence claims satisfy either subparagraph (A) or (B). I conclude that they satisfy the former.

---

[6] In addition to arguing that SLUSA preempts the plaintiffs' negligence claims, the defendants argue that the plaintiffs lack standing and that the claims are also preempted by the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1, *et seq.*, and the National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, 110 Stat. 3416. I express no opinion as to these issues.

[7] The 1933 Act contains functionally identical language, *see* 15 U.S.C. § 77p, but for convenience I will cite the relevant provisions of the 1934 Act.

"The element of a misrepresentation or omission of a material fact is satisfied when a plaintiff alleges a misrepresentation concerning the value of the securities sold or the consideration received in return." *Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 382 (E.D.N.Y. 2002) (internal quotations and ellipsis omitted). That is exactly what the plaintiffs have done here, despite their emphatic disavowal of their prior explicit allegations of misrepresentation, and their pared-down amended complaint. Putting aside the convoluted terminology and formulas associated with variable annuities, at bottom the plaintiffs simply allege that the defendants incorrectly priced certain investment options provided under the annuities. *See Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 702 (5th Cir. 2004) ("The issue of preemption thus hinges on the content of the allegations -- not on the label affixed to the cause of action.").[8]

This allegation also satisfies the "in connection with" prong. I stated in the *Janus* investor class opinion that the express language of the prong counsels against a narrow interpretation by which an alleged misrepresentation or omission is "in connection with the purchase or sale of a covered security" only when the plaintiff herself was the purchaser or seller of the security. *See In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 855 n.7. In its recent unanimous decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, the Supreme Court agreed:

> When this Court *has* sought to give meaning to the phrase in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the

---

[8] The plaintiffs concede as much in their opposition memoranda. (*See e.g.*, Wiggenhorn Opp. Br. at 4 ("Plaintiff has alleged that Equitable negligently calculated the annuity's 'unit values' which it sold to third party market timers. Thus, to the extent that Equitable may be said to have "misrepresented" the annuity's unit values, it was not in connection with Plaintiff's purchases or sales of the annuity units but, instead, was in connection with the market timers' purchases and sales of annuity units.")).

7

> *Birnbaum* case. See 193 F.2d at 464. But this Court, in early cases like *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971), and most recently in *SEC* v. *Zandford*, 535 U.S. 813, 820, 822, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction -- whether by the plaintiff or by someone else. See *O'Hagan*, 521 U.S., at 651, 117 S. Ct. 2199, 138 L. Ed. 2d 724. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.*, at 658, 117 S. Ct. 2199, 138 L. Ed. 2d 724. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford*, 535 U.S., at 819-820, 122 S. Ct. 1899, 153 L. Ed. 2d 1.

126 S. Ct. 1503, 1513 (2006) (emphasis in original). The Court went on to say:

> The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is distinguishable from a typical Rule 10b-5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; *the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities*.

*Id.* at 1515 (emphasis added). Thus, because the alleged harm to the plaintiffs' investments arose from the purchase and sale of sub-account AUs at stale (*i.e.*, misrepresented) prices, under *Dabit* it does not matter that the plaintiffs were not the ones who engaged in the purchasing and selling.

In sum, the plaintiffs' artful attempt at avoiding SLUSA preemption ultimately fails. The defendants' motions to dismiss are therefore granted. A separate order follows herewith.

Date: June 1, 2006                                    /s/_____
                                                      J. Frederick Motz
                                                      United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | * * | Civil No. 04-MD-15863 |
| NIKITA MEHTA<br><br>v.<br><br>AIG SUNAMERICA LIFE ASSURANCE CO. | *<br>*<br>*<br>*<br>* | Civil No. JFM-04-3943 |
| WIGGENHORN<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE CO. | *<br>*<br>*<br>*<br>* | Civil No. JFM-05-1674 |
| WOODBURY<br><br>v.<br><br>NATIONWIDE LIFE INSURANCE CO. | *<br>*<br>*<br>*<br>*<br>*****  | Civil No. JFM-04-3944 |

ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:
1. Defendants' motions to dismiss are granted; and
2. Judgment is entered in favor of Defendants against Plaintiffs.


June 1, 2006            /s/
Date                    J. Frederick Motz
                        United States District Judge

9